UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
_____
YUNETTA BARON

            PLAINTIFF               INDEX #

    -AGAINST-                 VERIFIED COMPLAINT
                                   WITH JURY DEMAND
PATRICIA LISSADE, LATICIA LAMAR,
IRENA KLADOVA, LAURA FLYER (Staff Attorney
NYC Commission Human Rights),
RAYMOND KARLIN (Staff Attorney
NYC Commission on Human Rights),
CARLOS VELEZ (Managing Attorney NYC
Commission On Human Rights), MICHAEL SILVERMAN
(Supervising Attorney Commission on Human Rights,
JANET KIM (Staff Attorney Commission on Human Rights),
ANDREW SONPON (Staff Attorney Commission on
Human Rights), SUDARSANA SRINISVASAN
(Staff Attorney Commission on Human Rights),
City of New York

            Defendants
_____

Plaintiff, Yunetta Baron, through her attorney Tamara Harris alleges as follows:

<u>THE PARTIES</u>

1. The plaintiff Yunetta Baron resides in Queens, New York

2. Defendants Laura Flyer, Raymond Karlin, Carlos Velez, Michael Silverman, Janet Kim, Andrew Sonpon, Sudarsana Srinisvasan maintain a principal place of business at 100 Gold Street, Suite 400, New York NY 10006.

3. The City of New York is located at 100 Church Street, New York, New York.

4. Patricia Lissade maintains her principal place of business at 460 Bloomfield Avenue, Montclair NJ 07042, although she resided in Queens, New York during the relevant time periods of this complaint.

5.  Irena Kladova maintains a principal office address at 15 York Street, Biddeford, Maine 04005.

6.  Laticia Lamar presently resides at 401 Strathspey Road, Glen Burnie Maryland 21061, although she resided at 286 West 147th Street, Apt 4C, New York, NY 10039 during all relevant times mentioned in this complaint.

<u>JURISDICTION</u>

7.  The federal court has jurisdiction over this matter as it raises a federal question.

<u>VENUE</u>

8.  The acts giving rise to this lawsuit occurred in Queens, New York and venue lies in the Eastern District, under 28 USC §1391(b)(2), because it is the judicial district where a substantial part of the events giving rise to the claim occurred and where the property that is the subject of this action is located.

<u>FIRST CAUSE OF ACTION- ABUSE OF PROCESS AGAINST PATRICIA LISSADE, LATICIA LAMAR, AND IRENA KLADOVA</u>

9.  In September 2013 Patricia Lissade, a woman whose income fell below the poverty line, was being forced out of the room she rented in Queens, New York.

10. She had been given 72 hours to vacate her present residence and needed to find an apartment immediately.

11. Patricia Lissade viewed an advertisement on Craigslist for a studio apartment in Forest Hills New York.

12. The advertisement indicated the apartment was being offered for rent, but subject to Board Approval.

13. Lissade called plaintiff, Yunetta Baron, in response to the advertisement.

14. Yunetta Baron owned the shares to the subject apartment in the coop.

15. Plaintiff was unable to personally show Lissade the apartment, but made arrangements for Lissade to gain access and view the apartment through a family member.

16. After viewing the apartment, Lissade communicated with plaintiff over the phone, to express an interest in renting it and moving in.

17. Plaintiff informed Lissade that the apartment was subject to Board approval, which included credit check and a screening for financial suitability; and that the Board would not be convening again until after Yom Kippor.

18. Lissade knew she would never pass such a screening process and credit check; knew her wages had been garnished because of prior unpaid bills; knew she had been forced to leave other apartments due to nonpayment of rent; knew her income was below poverty level; and knew that her credit score would reflect such financial unsuitability.

19. Plaintiff, who was Jewish, indicated she would retrieve an application from the Board and forward it to Lissade after the Jewish holiday- since no Board member would be available to speak on Sabbath or the weekend of Yom Kippor.

20. Shortly after Lissade viewed the apartment and expressed interest in the same, plaintiff was contacted by her brother, who needed a place to stay, because he was moving out of his marital residence.

21. Plaintiff agreed to allow her brother to live in the apartment she had originally listed for rent, after conferring with members of the Board to make sure such

action would be permissible.

22. Plaintiff was advised by the Board that no Board approval was necessary for a family member to move into the apartment, and she could move her brother in without submitting an application.

23. Plaintiff's brother moved into the apartment and plaintiff never went forward with submitting an application for any prospective renter to the Board.

24. After Yom Kippor weekend plaintiff spoke with Lissade and informed her that she was giving the apartment to a relative.

25. Plaintiff never met Lissade, who plaintiff learned was black and Haitian after being served with a copy of a charge of discrimination by the NYC Commission on Human Rights.

26. Lissade never disclosed to plaintiff that she was black or that she was Haitian.

27. Upon being informed that plaintiff had given her apartment to a relative, Lissade then conspired with her friend, Laticia Lamar, to devise a scheme to set plaintiff up for a fabricated discrimination claim- which scheme they perpetuated continuously from September 2013 through August 2018 (when the Commissioner of the New York City on Commission on Human Rights dismissed all charges of discrimination against plaintiff)

28. The scheme began when Lissade instructed Lamar to find a caucasion person to dupe plaintiff into showing her apartment; and whose job would be to convince plaintiff to show the caucasion person her apartment. Upon getting access to the apartment and requesting an application, Lissade would bring a discrimination claim against plaintiff.

29. Lissade and Lamar were unable to find anyone in the state of New York willing to participate in their scheme to set plaintiff up for a discrimination complaint.

30. When efforts to find an accomplice in New York failed, Lamar contacted her friend, Irena Kladova, in Maine.

31. Per Lamar and Lissade's instructions, Irena Kladova's job was to set plaintiff up for a discrimination claim; and to dupe plaintiff into forwarding her an application for the apartment by claiming she was an interested prospective renter.

32. Irena Kladova agreed to assist Lissade and Lamar in this set up.

33. However, the scheme did not work and plaintiff never sent an application to Irena Kladova.

34. Although plaintiff received multiple calls from interested renters, she never received a call from anyone who identified themselves as Irena Kladova; nor did plaintiff ever agree to provide anyone with an application after she elected to give the apartment to her brother.

35. Plaintiff never presented any applicant to the Board of Directors after telling Lissade she was giving the apartment to her brother.

36.  Notwithstanding this, Irena Kladova continued to assist Lissade and Lamar in their scheme to concoct a discrimination claim, by agreeing to provide false information to the NYC Commission on Human Rights.

37. Specifically, Irena Kladova proffered false information to the NYC Commission on Human Rights, claiming that plaintiff offered to show her the apartment and then supply an application, and that plaintiff offered this application to Kladova after telling Lissade a relative was moving in.

38. Notably, Kladova was never able to produce an application, no application was ever provided to her by plaintiff, and no application was ever presented by plaintiff to the Board of Directors of her building.

39. Irena Kladova also agreed to act as a supporting witness to Lissades' frivolous complaint about housing discrimination, to facilitate the case going to trial (through her continued cooperation through written submissions, telephone calls, trial on November 9, 2016, the recommendation of dismissal by an Administrative Law Judge in August 2017, and the ultimate dismissal of this case in August 2018 by the Commissioner of the Division of Human Rights).

40. The scheme to set plaintiff up for a false and malicious discrimination claim began in September 2013- when Lissade filed a complaint with the Commission on Human Rights.

41. Lissade claimed, in her complaint, that she was a "qualified" applicant for an apartment and was denied the apartment because plaintiff did not want to rent the apartment to a Haitian person.

42. Lissade furthered this complaint by alleging she had two supporting witnesses to this discrimination: Patricia Lamar and Irena Kladova.

43. Lamar communicated with the New York City Commission on Human Rights continuously from September 2013 through trial in November 9, 2019 (when she ultimately testified perjuriously under oath).

44. During these communications with the New York City Division of Human Rights, and during the course of her perjurious testimony at trial, Lamar falsely informed the New York City Commission on Human Rights that the plaintiff had a

conversation with Irena Kladova, whereby plaintiff agreed to show the subject apartment to Irena Kladova (after plaintiff told Lissade the apartment was unavailable).

45. Lamar further told the NYC Commission on Human Rights that Irena was white and Russian; and that plaintiff agreed to provide an application for the subject apartment to Irena Kladova (after plaintiff refused to do so for Lissade).

46. Lamar did not witness any conversation between Irena Kladova and Yunetta Baron to substantiate the allegations Lamar made to the New York City Commission on Human Rights, and her entire story was based on lies and multiple levels of fabricated hearsay.

47. Irena Kladova was then interviewed by attorneys at the NYC Commission on Human Rights- defendants Raymond Karlin and Laura Flyer.

48. Irena's story was inconsistent with the stories of her two accomplices- Lamar and Lissade- which inconsistencies the NYC Commission on Human Rights attorneys, Flyer and Karlin, noted in their written notes.

49. The material inconsistencies noted by attorneys Karlin and Flyer included 1. Kladova admitting she never spoke with plaintiff about an application and contradicting Lissade's version about plaintiff promising an application once Kladova viewed the apartment; 2. the absence of a heavy Russian accent when Karlin and Flyer spoke to Irena (contrary to Lissade and Lamar's version about Kladova being treated better than Lissade because of her Russian accent); and 3. Kladova's story about plaintiff describing a 2BR apartment for rent over the telephone when the subject apartment was indisputably a studio (which Kladova

would have known if she had really had a conversation with plaintiff about the apartment).

50. Lissade's story about being discriminated against because she was Haitian, and how Irena Kladova was evidence of this discrimination, was a total fabrication to make money off a fake discrimination claim and, ultimately, a trial.

51. Lamar's story about having knowledge of plaintiff's purported housing discrimination; conversations plaintiff had with Irena; and discriminatory animus toward Lissade because of her Haitian ancestry- were all predicated on lies.

52. Kladova's incredible and inconsistent story was predicated on a lies.

53. Lissade, Lamar, and Kladova acted together and conspired together to provide false information to the New York City Commission on Human Rights by falsely alleging plaintiff engaged in housing discrimination, and making up facts to support their fabricated story.

54. They engaged in these fabrications continuously- through depositions in October 2016, phone conferences and in-person meetings with the Commission, through trial on November 7th and 9th of 2016 and up until the point the Commissioner of NYC Commission on Human Rights dismissed all charges against plaintiff in August 2018.

55. Both Lamar and Lissade intentionally and maliciously provided false testimony during different stages of this litigation about a contrived and fake discrimination claim; and fabricated claims about nonexistent emotional damages.

56. Lamar, Lissade and Kladova engaged in the above actions with the intent of making money from plaintiff, based on their fabricated discrimination claims,

statements to the Commission, and/or testimony at trial.

57. While the case against plaintiff was pending in front of the New York City Commission on Human Rights, and the issue of whether the Commission would seek $45,000 in damages against plaintiff and on behalf of Lissade, Lamar allowed Lissade to move into her home rent free.

58. Lamar would be awarded for her participation in this frivolous scheme to make a fake discrimination claim, from the money she and Lissade expected to obtain from the prosecution of plaintiff for discrimination.

59. The Commission ultimately sought damages on Lissade's behalf totaling $45,000 against plaintiff for housing discrimination, $20,000 of which was supposed to compensate Lissade for her purported emotional damages.

60. Plaintiff refused to enter settlement discussions with the New York City Commission on Human Rights and Lissade, who attended the mandatory settlement conference in 2016 and all proceedings thereafter, as plaintiff was adamant she had not violated any law.

61. The case was set for trial in November 2016, and the NYC Commission on Human Rights defendants (Flyer, Karlin, Velez, Silverman, Kim, Srinisvasan, and Sonpon) brought plaintiff to trial on charges related to national origin discrimination in housing on November 7, 2016 and November 9,2016.

62. The Commission's witness list for the November 2016 trial included Lissade, Lamar and Kladova- who continued to cooperate with the NYC Commission on Human Rights by perpetuating lies about discrimination and emotional trauma stemming from their fabricated claims of discrimination.

63. Defendants Velez, Kim, and Silverman handled the litigation at trial, while investigative attorneys from the NYC Commission on Human Rights, Karlin and Flyer, testified against plaintiff and on behalf of Lissade at trial- even though they were also the attorneys on the case.

64. Irena Kladova cooperated with the Commission up to an including the start of trial on November 7,2019- to the point where the Commission obtained permission for her to testify from another location via video.

65. Kladova, however, never showed up to testify under oath at the trial, after perpetrating her lies about plaintiff up until the day of trial; and after providing the defendants with an unsworn, undated, and unsigned purported "affidavit"; and also never appeared to testify by video conference after the court granted permission for the same.

66. Defendants Velez, Silverman, Srinisvasan, and Kim represented to the Court that Kladova would not testify and when asked if they needed an adjournment to secure her appearance, informed the court that they never intended to call Kladova to the stand- clearly cognizant that their material witness was lying.

67. The trial resolved with a recommendation by Administrative Law Judge Pogoda that the case against plaintiff be dismissed on the merits, finding (among other things) Lamar and Lissade were not credible, and that it was likely Lissade had promised to compensate Lamar for her assistance in the prosecution of plaintiff, and finding plaintiff had not engaged in any discrimination against Lissade.

68. Defendants Lissade, Lamar and Kladova wrongfully initiated, procured and continued a legal proceeding against plaintiff by conspiring to have a false

complaint filed against plaintiff- alleging housing discrimination based on national origin- and supplying false information and false witnesses to the NYC Commission on Human Rights, in an effort to secure a monetary judgment from plaintiff.

69. This course of conduct in abusing process was continuous and included Irena, Lamar and Lissade's stream of oral and written statements to the Commission through November 2016; Lissade's deposition in October 2016; Kladova's purported sworn affidavit to the Commission leading up to trial and request to appear by video at trial; and the perjurious testimony of Lamar and Lissade at trial on November 7, 2019 and November 9,2019.

70. This continuous course of conduct by defendants Lamar, Kladova and Lissade resulted in a final order of the Carmelyn Malalis (Commissioner/Chair of New York City Commission on Human Rights) dismissing the Complaint against Yunetta Baron on August 8,2018 and finding she was not liable for discrimination.

71. Defendants Lissade, Lamar and Kladova caused a proceeding to be initiated against plaintiff that completely lacked probable cause and was predicated on their lies; they thereafter continued to perpetuate these lies in 2016 when Lissade lied in her deposition, through trial in October 2016, and up until the case against Yunetta Baron was dismissed on the merits on August 8, 2018.

72. Plaintiff's abuse of process claim became actionable on August 8, 2018, when the Commissioner of the New York City Commission on Human Rights dismissed the complaint of discrimination of Yunetta Baron, and exonerated her of all

allegations of discrimination- as this finding established the injuries defendants caused plaintiff to endure were without justification.

73. The continuous course of conduct of Lissade, Lamar and Kladova was malicious and done with an intent to do harm without excuse of justification.

74.  Lissade, Lamar and Kladova used regularly issued process in a perverted manner to obtain a collateral objective; to wit, 1. they conspired to falsify a story of discrimination to cause the Commission on Human Rights to make a finding of probable cause and then initiate a prosecution; 2. engaged in a continuous course of conduct to ensure these lies culminated in a trial (including Lissade's fabricated claims of emotional distress through November 2016, Lamar and Kladova's continued false statements to the Commission regarding fabricated discrimination claims against plaintiff through November 2016,  Lissade's false deposition testimony in October 2016; and Lamar and Lissade's perurious testimony at trial in November of 2016.

75. Defendants engaged in this conduct with the malicious intent to do harm and, as evidence by the August 2018 Order of the Commissioner of the NYC Commission on Human Rights, caused harm to plaintiff without excuse or justification.

76. There was an entire lack of probable cause in the proceeding as a whole, and defendants sought to unlawfully interfere with plaintiff's property in Forest Hills by lodging a false complaint about discrimination in housing; generating false evidence; and continuing to forward false information to the Commission; and continuing to give false statements and testimony in deposition and trial through

November 2016.

77. Plaintiff suffered special and compensatory damages as a result of defendants conduct in that she incurred legal fees in excess of $50,000 related to defendants Lissade, Lamar and Kladova's malicious and fabricated accusations, court costs, deposition costs.

78. Plaintiff also suffered emotional harm, stress and anguish as a result of the malicious and fabricated allegations, fake evidence, and contrived testimony of defendants- who abused process by using regularly issued process with an intent to do harm without excuse or justification, and used this process in a perverted manner to obtain a collateral objective (secure money from plaintiff via their falsified evidence and perjurious testimony).

79. Plaintiff seeks damages in the amount of at least $50,000 damages to compensate for legal fees and other expenses incurred from defendant's abuse of process; 20 million dollars for emotional damages; and 20 million dollars for punitive damages, and compensatory damages related to future legal fees and court costs.

SECOND CAUSE OF ACTION:
DEFENDANTS LAURA FLYER (Staff Attorney NYC Commission Human Rights), RAYMOND KARLIN (Staff Attorney NYC Commission on Human Rights), CARLOS VELEZ (Managing Attorney NYC Commission On Human Rights), MICHAEL SILVERMAN(Supervising Attorney Commission on Human Rights, JANET KIM (Staff Attorney Commission on Human Rights), ANDREW SONPON (Staff Attorney Commission on Human Rights), AND SUDARSANA SRINISVASAN (Staff Attorney Commission on Human Rights) COMMITTED MALICIOUS PROSECUTION AGAINST PLAINTIFF IN CONTRAVENTION OF 42 USC SECTION 1983- BY ENGAGING IN A CONTINUED COURSE OF CONDUCT (BIASED INVESTIGATION, SHAM FINDING OF PROBABLE CAUSE, CONCEALMENT OF EXCULPATORY EVIDENCE, ISSUANCE OF LAWLESS SUBPOENAS, AND CONDUCTING A TRIAL WITHOUT PROBABLE CAUSE) IN AN EFFORT TO FORESTALL FURTHER COMPLAINTS BY LISSADGE AGAINST THE COMMISSION'S ATTORNEYS

80. Defendants Flyer, Karlin, Velez, Silverman, Kim, Srinisvasan, and Sonpon are all attorneys at the New York City Commission on Human Rights.

81. All of these defendants played a role in the investigation into Patricia Lissade's allegations of housing discrimination against the plaintiff.

82. Defendants Flyer, Karlin, Sonpon, Srinisvasan, Velez, Silverman and Kim were responsible for investigating Lissade's allegations about housing discrimination.

83. All of the above defendants were entrusted to conduct such investigation in a fair, impartial and unbiased manner- to determine if probable cause existed to believe that plaintiff had engaged in housing discrimination.

84. Defendant Laura Flyer handled the intake stage of Lissade's complaint.

85. Laura Flyer was entrusted to conduct the initial investigation into this matter, as she was a staff attorney at the New York Commission on Human Rights.

86. Flyer interviewed Lissade and drafted the Verified Complaint.

87. The complaint falsely proclaimed Lissade was financially qualified to rent plaintiff's apartment.

88. The complaint falsely asserted that plaintiff offered to show and supply Irena Kladova with an application after plaintiff told Lissade the apartment was unavailable.

89. Lissade claimed Irena Kladova was Russian with an accent, was given specific instructions by Lissade's friend to set Baron up to establish a discrimination claim, and was treated differently than Lissade when she requested an application.

90. Flyer obtained, what she claimed (and later testified) was an affidavit, from Kladova.

91. The "affidavit", however, was not anything near a real affidavit. It was *not signed* by the purported witness (even though a notary notarized this unsigned statement); it had no date or address from which it came; no envelop with the sender's address, and was not made under penalty of perjury.

92. No objectively reasonable attorney in Laura Flyer's position would have believed that such a purported affidavit sufficed to establish probable cause and initiate a prosecution for discrimination with OATH.

93. Additionally, the facts in the affidavit did not comport with Lissade's story about Irena Kladova being offered an application after Lissade was told by the plaintiff that the apartment was unavailable.

94. Flyer then interviewed a woman she believed to be Irena by dialing a number that Lissade gave her.

95. However, contrary to Lissade's story, Flyer had difficulty discerning a Russian accent.

96. Flyer noted this discrepancy in Lissade's story.

97. When Flyer did not issue a finding of probable cause forthwith, Lissade complained about Flyer to Carlos Velez, one of the supervising attorneys at the NYC Commission on Human Rights.

98.  When Velez and Flyer still did not issue a finding of probable cause against plaintiff forthwith, Lissade complained to the Deputy Commissioner at the NYC Commission on Human Rights, Clifford Mulqueen, about both Flyer and Velez.

99. Raymond Karlin was an additional attorney at the NYC Commission on Human Rights assigned to investigate Lissade's allegations.

100.     Karlin spoke to Irena Kladova on the phone and noted discrepancies in her story.

101.     In speaking with Kladova he noted that the apartment at issue was a studio and Kladova described a conversation with plaintiff that entailed discussion of a 2 BR; Karlin also noted that Kladova told him she was never promised an application, as Lissade originally claimed to the Commission.

102.     Karlin wrote notes regarding these inconsistencies between Lissade's story and Kladova.

103.     These noted inconsistencies were in addition to Flyer's notes about the difficulty in discerning a Russian accent in Kladova's voice, contrary to the version of events given by Lissade.

104.     Carlos Velez and all the above co-defendants decided to issue a finding of probable cause against plaintiff, and did issue such finding, in order to forestall further complaints by Lissade to the Deputy Commissioner at NYC Division of Human Rights about their job performance.

105.     This finding of probable cause, signed by Velez, was not issued because there was actual probable cause to believe plaintiff engaged in housing discrimination.

106.     The finding of probable cause, signed by Velez, initiated a prosecution oof plaintiff before the Office of Administrative Trials and Hearings.

107.     The finding of probable cause, signed by managing attorney Velez, was issued solely to forestall further complaints by Lissade about Velez and the defendant/attorneys working under his supervision.

108.     The finding of probable cause was a sham.

109.     The the goal of Velez and the above co-defendants in issuing a finding of

probable cause was to use plaintiff as a scapegoat to appease Lissade- by pathing

a path for Lissade's frivolous discrimination complaint to go to trial, and stop

Lissade from making further complaints to high ranking officials at the NYC

Commission on Human rights.

110.     All of the above named defendants engaged in a continuous court of

conduct to conceal exculpatory evidence and evidence that would impeach the

credibility of their witnesses in order avoid disclosing the myriad of weaknesses

and inconsistencies in Lissade's allegations- which did not comport with due

process.

111.     Defendant Karlin, with the assistance of Commission attorney's Flyer,

Velez, Silverman, Kim, Sonpon , and Srinisvasan concealed the existence

handwritten notes that Karlin took during his interview of Irena Kladova from the

documents produced in discovery, and continued to conceal these notes up until

trial in November 2016.

112.     In these notes, Karlin documented inconsistencies in Kladova's story

(Kladova claimed plaintiff described a 2BR apartment to her over the phone,

when the apartment was a studio.

113.     In these notes Karlin documented inconsistencies between Kladova and

Lissade's story regarding Lissade's main allegation (that plaintiff promised an

application to Kladova after telling Lissade the apartment was not available) and

Kladova's refutation of the same.

114.    All of the defendants/NYC Commission on Human Rights attorneys conspired together to withhold this evidence from the disclosures made in discovery, and concealed this evidence all the way through the actual trial, to avoid exposing the weaknesses in the case and its purported witnesses.

115.    This concealment of impeaching and exculpatory evidence during the discovery phase of the case and up until trial in November 2016 was not objectively reasonable, and was done with the malicious intention of denying plaintiff a fair trial after the aforementioned defendants initiated a prosecution with OATH (Office of Administrative Trials and Hearings) via a sham finding of probable cause and evidence they knew to be incredible.

116.    Defendant Karlin (working under the supervision of managing attorney Velez) also purposely refused to acknowledge evidence presented by plaintiff, which exonerated her of misconduct- in order to ensure the case proceeded to trial and in order to avoid being the target of further complaints by Lissade to Commission's high ranking officials.

117.    Plaintiff provided Karlin with the identity of the members of the Board of Directors for her coop, so he could investigate and confirm that plaintiff never submitted any applications for prospective tenants after informing Lissade that her apartment was no longer available (thereby refuting Lissade's allegations that prospective tenants who were not Haitian, like Kladova, were treated more favorably than her in the application process).

118.    Karlin refused to interview the Board of Directors or follow through with acquiring any evidence that would refute Lissade's claims and exonerate plaintiff.

119.     Plaintiff even supplied Karlin with an affidavit of her brother confirming

he moved into the apartment, and a written statement from a Board member,

confirming no applications for any prospective tenant were ever submitted to the

Board during the relevant time period.

120.     Karlin refused to contact the Board of Directors in the course of his

investigation, to avoid acquiring evidence that would detract from probable cause-

even after one of the Board members supplied him with a written statement.

121.     Karlin never interviewed a single member of the Board of Directors to

inquire as to whether plaintiff's version of events- that she gave the apartment to

her brother in September 2013 and never presented any prospective renter to the

Board as a potential applicant during that time frame- was true.

122.     Karlin never interviewed Nerri Khaimov, plaintiff's brother.

123.     Plaintiff had prior tenants of different races and nationalities (exposing the

frivolity of Lissade's national origin discrimination claim), whose records were

possessed by the Board- but Karlin refused to request or subpoena any such

records- because it would detract from the existence of probable cause.

124.     Plaintiff supplied an affidavit from her brother, attesting to the fact he

lived in the subject apartment, and a written statement of a Board member, before

the finding of probable cause.

125.     Prior to and after issuing the finding of probable cause: Karlin, Velez,

Silverman, Srinisvasan, Sonpon, Kim, and Flyer disregarded the affidavit of

plaintiff's brother.

126.     Prior to and after issuing the finding of probable cause Karlin, Velez,

Silverman, Srinisvasan, Sonpon, Kim, and Flyer disregarded the statement from the Board.

127.     Prior to and after issuing the finding of probable cause Karlin, Velez, Silverman, Srinisvasan, Sonpon, Kim, and Flyer disregarded all evidence that exonerated plaintiff of any wrongdoing, including contradictory oral statements made by Kladova; and then continued to conceal this evidence leading up to trial in November 2016.

128.     The above named defendants also concealed Karlin's notes, which specified material inconsistencies in Kladova's story- which negatively impacted on Lissade's credibility, as it related to material issues of fact.

129.     The above named defendants handled this entire case in a completely biased manner, in that they disregarded the indisputable fact that plaintiff and Lissade had never even met face to face or discussed Lissade's nationality; disregarded plaintiff's witnesses; refused to interview a single witness who would support plaintiff's version; and only interviewed Lissade's witnesses (before concealing notes of Karlin and Flyer that would detract from their credibility) and took the case to trial on November 7, 2016 and November 9,2016 to forestall further complaints by Lissade against the aforementioned defendants.

130.     All of the above defendants also disregarded Lissade's admission that she conspired with Lamar to set Baron up for a discrimination claim with Kladova.

131.     Prior to issuing a finding of probable cause, defendants Flyer and Karlin obtained a purported affidavit from Irena Kladova that was unsigned, undated and not under penalty of perjury; for which any reasonable attorney would know did

not comport with the requirements of an affidavit and would never support a

finding of probable cause; or lead a reasonable attorney to take such a case to

trial.

132.     No one took any steps to verify the person being interviewed was Irena

Kladova and simply called the number provided by Lissade.

133.     No efforts were made to meet Kladova in person at the Commission or by

video conference before issuing a finding of probable cause.

134.     No efforts were made by any defendant to obtain a real affidavit from

Irena before issuing a finding of probable cause or taking this case to trial in

November 2016.

135.     Defendants issued their finding of probable cause, whereby they claimed

Lissade was denied an apartment based on national origin for which she was

QUALIFIED, knowing she was not financially qualified for this apartment and

knowing that plaintiff had no idea what Lissade's race and ethnicity were-

because she never met Lissade.

136.     The Commission's case hinged on Lissades' story that a woman with a

Russian accent (Irena) was offered an application after Lissade was told the

apartment was being given to a relative.

137.     However, defendant Karlin and defendant Flyer's notes clearly reflected

they knew Lissade's story was not consistent with the evidence- because Irena

Kladova did not have a discernable Russian accent; Irena Kladova indicated there

was no promise of an application when interviewed by the Commission; and Irena

Kladova's story about speaking to plaintiff about a 2BR apartment did not

comport with reality- since the apartment plaintiff advertised was a studio.

138.    To compound these inconsistencies, defendants received an "affidavit" that did not comport with any of the requirements of an affidavit (no signature, date, or penalty of perjury clause) for which there was no envelop containing so much as a return address for Irena Kladova.

139.    Any reasonable attorney at the Commission investigating this case (without personal and impure motives to forestall further complaints by Lissade to defendants' supervisors) would have dismissed it with a finding of no probable cause or dismissed the case prior to trial in accordance with their ethical responsibilities to dispose of cases known to be predicated on false allegations.

140.    However, Commission attorneys Flyer, Velez, Silverman, Sonpon, Srinisvasan, Kim and Karlin did the opposite- conducting a biased investigation in bad faith; issuing a finding of probable cause to forestall further complaints by Lissade targeting them; concealing exculpatory evidence during the discovery phase of the case (notes by Karlin and Flyer specifying inconsistencies between Lissade and Kladova's testimony and mental health records of Lissade) and through trial; lying about discoverable evidence; and seeking $45,000 in damages (inclusive of $20,000 emotional damages for Lissade) when they knew Lissade's therapy records controverted her claims of emotional trauma and completely controverted her claims that plaintiff had caused the alleged emotional trauma.

141.    This bad faith continued when all defendants, acting in concert, prepared and issued a lawless subpoena for plaintiff's phone records in violation of OATH rules, which they served without obtaining the signature of Judge Pogoda- which

is required; and by willfully failing to serve the subpoena on plaintiff or her counsel.

142.     After unlawfully obtaining records via their lawless subpoena the Commission concealed these records from plaintiff during discovery, and despite demands for such evidence- resulting in the ALJ precluding the illegally and surreptitiously obtained evidence at trial.

143.     Notably, the attorneys for the Commission- Flyer, Karlin, Velez, Silverman, Kim, Sonpon, and Srinisvasan investigated Lissade's claims of emotional trauma stemming from her accusations of housing discrimination by plaintiff; her claims that she sought therapy as a result of such discrimination by plaintiff; and her claims that plaintiff caused her to sustain emotional trauma.

144.     Upon obtaining these mental health records prior to the November 2016 trial, all of the above named defendants learned that Lissade had lied about her emotional damage claim.

145.     Contrary to Lissade's story, her therapy records indicated she had been in therapy seven months before viewing Baron's apartment and had not once complained about her interaction with Baron causing her any distress during the entire course of her therapy.

146.     The therapy records also refuted Lissade's claim about being qualified for the apartment, as alleged in the complaint that Laura Flyer drafted on Lissade's behalf; reflecting Lissade was below poverty, unable to pay rent and monthly expenses, had been served with a wage garnishment notice, and had blamed employment discrimination as the cause of her financial troubles.

147.     The records further indicated Lissade had a track record of being fired

from a multiplicity of different jobs, being thrown out of prior apartments, and of

making frivolous complaints- blaming employment discrimination as the basis for

being unable to hold a job (eight consecutive times) and claiming police officers

were engaging in discrimination.

148.     Lissade had also complained in a public and publicized meeting in New

Jersey that police were targeting her and her black companions each time she

dated black men by following her around on dates.

149.     It was clear from plaintiff's therapy records that she believed every

mishap in her life, her job, and her love life- was a result of discrimination. Yet,

despite all her complaints of discrimination in the workforce and with the police-

Lissade never once complained or mentioned housing discrimination by plaintiff

to her therapist, and the records were devoid of a single mention of the plaintiff.

150.     The therapy records also refuted Lissade's claims that she was emotionally

traumatized by plaintiff's actions- as the records made ZERO mention of plaintiff

and focused entirely on Lissade's financial instability, unstable childhood, failed

personal relationships, and employment discrimination being the root of her

financial despair.

151.     The records were devoid of any mention of plaintiff, her apartment, or the

alleged housing discrimination Lissade claimed she fell victim to.

152.     Despite possessing these records, defendants Flyer, Karlin, Velez, Kim,

Silverman, Sonpon, and Srinisvasan issued a finding of probable cause against

plaintiff and thereafter sought $45,000 for damages ($20,000 emotional) at the

November 2016 trial- even though they knew Lissade's emotional damage claim was baseless and false; and even though they knew Lissade sought therapy months before seeing plaintiff's apartment.

153.     Defendants effort to obtain $45,000 in damages from plaintiff (inclusive of emotional damages) was not based on a reasonable belief plaintiff engaged in discrimination.

154.     Rather the above defendants issued a finding of probable cause, concealed evidence, issued lawless subpoenas, ignored and concealed exculpatory evidence and mental health record, and took a case to trial in November 2016 with an impure motive; to wit, to forestall future complaints by Lissade that would impact their employment at the Commission.

155.     Plaintiff was used as a scapegoat by all NYC Commission attorneys/defendants to quell Lissade's Complaints to the supervisors at the NYC Commission on Human Rights about their performance as investigating attorneys and to avoid any future complaints that would arise from their refusal to prosecute this baseless case-even though all defendants knew that probable cause was lacking.

156.     All of the above defendants at the Commission willfully ignored and concealed exculpatory evidence to achieve this objective.

157.     Defendant concealed these therapy records and then fought against disclosure- only producing them immediately before the commencement of trial, when they were ordered to do so by the Court- after Lissade disclosed the Commission was in possession of her records.

158.     Even though a reasonable investigating attorney at the Commission would have closed this case out with a finding of no probable cause at its inception- or at least at some point prior to trial, Flyer, Karlin, Silverman, Sonpon, Srinisvasan, Kim and Velez were afraid to do so because Lissade immediately began making complaints to supervisors at the New York City Commission on Human Rights that her case was not moving forward the way she wanted.

159.     All defendants participated in issuing a sham finding of probable cause, initiating a prosecution before OATH, concealing exculpatory evidence, seeking damages for emotional injuries they knew did not actually exist, and setting the matter down for a public trial (where they sought $45,000 emotional and compensatory damages against plaintiff), to forestall Lissade's complaints, and knowing there was no probable cause to prosecute this case via an actual trial.

160.     After causing this case to go to trial in November 2016, all defendants then refused to call Irena Kaldova to testify at trial in person or by video (after being granted permission for her to testify via either method), because all defendants knew she was a liar and knew that subjecting her to cross-examination would expose the frivolity of Commission's case.

161.     During the trial Laura Flyer testified for Lissade and committed perjury- refusing to admit Lissade had her removed from the case via complaints to superiors, even after being showed documentary proof of the same; and feigning lack of recollection whenever asked questions that would negatively impact Lissade's case.

162.     Any objectively reasonable lawyer at the Commission entrusted with this

investigation, much less experienced investigators/litigators like Flyer, Velez, Karlin, Sonpon, Silverman, Kim and Srinisvasan, would know 1. That the "affidavit" of Irena Kladova which had NO SIGNATURE, NO DATE, NO ADDRESS, and WAS NOT UNDER PENALTY OF PERJURY- was not an affidavit; 2. that it was a violation of due process to conceal exculpatory and impeaching evidence during discovery, including Lissade's therapy records; 3. that it was objectively unreasonable to issue a finding of probable cause, and prosecute plaintiff, without interviewing a single of plaintiff's witnesses; 4. That it was objectively unreasonable to prosecute plaintiff where there was undisputable evidence that Lissade never met plaintiff or disclosed her national origin to plaintiff; 4. that it was objectively unreasonable and a violation of due process to conceal Kladova's oral statements  and written notes documenting how those statements contradicted Lissade's story and to issue lawless and secret subpoenas; 5. That Lissade's admission she actively tried to set plaintiff up for a discrimination claim rendered her incredible; 6. That is was objectively unreasonable for defendants to pursue an emotional damage claim against plaintiff when Lissade's records were devoid of any mention of plaintiff and contradicted Lissade's version of events completely; and 7. that it was objectively unreasonable and malicious for all of the above named defendants to issue a baseless and unjustified finding of probable cause, and to commence prosecution and trial against plaintiff, where the only motive for doing so was to use plaintiff as a scapegoat to appease Lissade and forestall further complaints to the Commission's higher ups about defendants' job performance.

163.     The above Defendants were state actors acting under color or state law when they engaged in the malicious prosecution of plaintiff.

164.     Defendants' conduct was not objectively reasonable.

165.     Defendants had no probable cause to support a finding that plaintiff had engaged in discrimination against Lissade.

166.     Plaintiff's right to be free from malicious prosecution under 42USC Section 1983 is a clearly recognized right in the Second Circuit.

167.     At the close of the trial (which Velez, Kim and Silverman prosecuted) the Administrative Law Judge recommended that the Commission's case against Yunetta Baron for racial and national origin discrimination be dismissed on August 28, 2017, making note of deficiencies in the credibility and testimony of Lissade, Lamar, attorney Karlin and attorney Flyer- all of whom testified at the trial.

168.     On August 8,2018 Carmely Malalis, Commissioner/Chair of the New York City Commission on Human Rights issued an Order agreeing with the decision of Judge Pogota, and ordering that the discrimination Complaint against plaintiff be dismissed.

169.     This was a favorable termination for Yunetta Baron.

170.     Accordingly, Karlin, Flyer, Velez, Silverman, Kim, Sonpoon, and Srinisvan engaged in malicious prosecution under 42 USC Section 1983 through a continued course of malicious conduct; to wit, they conducted a biased investigation, filed a sham finding of probable cause, initiated a proceeding with malice and without probable cause, concealed exculpatory evidence, issued

lawless subpoenas resulting in a preclusion order against the Commission on or about November 7,2017, and conducted a trial on a case they knew to be frivolous in order to forestall further complaints by Lissade to supervisors at the Commission- before the trial terminated favorably to Baron.

171.     All of the above defendants engaged in malicious prosecution under 42 USC Section 1983 and the 14th amendment, with the intent to deprive plaintiff of her money, property and potentially her liberty under NY Human Rights Law §299- since failure to comply with an order of the Commission (including for monetary damages) is a misdemeanor punishable by up to one year in prison.

172.     Defendants Flyer, Karlin, Velez, Silverman, Kim, Sonpon, and Srinisvasan initiated a prosecution against the plaintiff after knowing Lissade's allegations were false, defendants lacked probable cause to believe the proceeding could succeed, defendant acted with malice, and the prosecution was terminated in the plaintiff's favor.

173.     Plaintiff suffered severe trauma as a result of defendants malicious actions and seeks 20 million dollars in emotional damages, 20 million dollars in punitive damages and 50,000 dollars in compensatory damages (inclusive of all legal fees and court costs).

THIRD CAUSE OF ACTION MALICIOUS ABUSE OF PROCESS IN VIOLATION OF 42 USC SECTION 1983 AND ABUSE OF PROCESS UNDER STATE LAW AND VIOLATION OF PLAINTIFF'S FOURTEENTH AMENDMENT RIGHT TO A FAIR TRIAL.

174.     Plaintiff repeats and realleges all of the aforementioned allegations.

175.     Plaintiff previously filed notice of claim.

176.     All defendants, acting together and while handling the investigatory

functions of an attorney at the New York City Commission on Human Rights, issued a finding of probable cause that Baron engaged in racial and national origin discrimination- knowing that no such probable cause existed- in order to initiate a prosecution with OATH and conduct a trial..

177.     All of the above defendants issued a baseless finding of probable cause and baseless prosecution (and trial), despite knowing that 1. plaintiff never met Lissade; 2. Plaintiff never knew Lissade's race or ethnicity; 3. Plaintiff never submitted any applications to the Board for the subject apartment to render her treatment of Lissade disparate in any way; 4. The Board confirmed plaintiff's version of events- that she submitted no applications to the Board because she placed her brother in the subject apartment; 5. the only corroboration for Lissade's story were two co-conspirators in an admitted plot to set plaintiff up for a discrimination claim; and an unsworn, unsigned, and undated writing that Flyer and Karlin falsely professed was an "affidavit" of Irena Kladova (and which was inconsistent with Lissade's story); 6. there was no evidence plaintiff ever forwarded Irena Kladova an application for the subject apartment after Lissade was informed the apartment was unavailable; 7. And that Lissade's therapy records contradicted all her allegations to the Commission about plaintiff being the cause of her emotional trauma and about Lissade being financially qualified for the subject apartment.

178.     All of the above named defendants tried to bolster their case and the issuance of their finding of probable cause (and related prosecution) by concealing exculpatory and impeaching evidence (including notes of Flyer and

Karlin), and concealing the fact they issued illegal subpoenas to obtain documents

that they felt would bolster their case, in contravention of OATH rules- resulting

in a sanction of preclusion at trial.

179.     All defendants acted in concert to engage in a sham investigation of

Lissade's claims, issue a finding of probable cause when such probable cause was

lacking, and schemed to obtain evidence illegally and conceal evidence that

harmed their case- with the goal of appeasing Lissade and forestalling additional

complaints against them by Lissade to the heads of the NYC Commission on

Human Rights.

180.     All of the defendants (Velez, Srinisvasan, Sonpon, Kim, Silverman,

Karlin, and Flyer) acted in bad faith; to wit, defendants used regularly issued

process, either civil or criminal; with an intent to do harm without excuse or

justification, and there was a use of the process in a perverted manner to obtain a

collateral objective.

181.     Defendants issuance of a finding of probable cause and prosecution of

plaintiff for violations of New York's discrimination laws, in order to forestall

future complaints by Lissade and to use plaintiff as an innocent scapegoat to

protect their own jobs, was any actual misuse of the process to obtain an end

outside its proper scope.

182.     Defendants actions interfered with plaintiff's property by causing her to

expend huge sums of money defend the frivolous action that all the above

defendants instituted against her, which directly impacted her property, after a

sham investigation resulted in a frivolous finding of probable cause; and in order

to defend a baseless prosecution seeking $45,000 in damages.

183.     Moreover, under the law it is a penal law violation for plaintiff to refuse to cooperate with the Division on Human Rights' attorneys (defendants) in the course of their investigation or to fail to comply with a Commission order-punishable by up to one year incarceration.

184.     Despite rendering such cooperation, all of the above defendants used that investigation as a mechanism to engage in illegal subpoena practice, concealment of exculpatory and impeaching evidence, and as a mechanism to forestall future complaints by Lissade for a case they knew had no merit.

185.     In so doing, all of the above defendants committed malicious abuse of process; to wit, they employed regularly issued legal process (notice of probable cause resulting in trial) to try compel performance or forbearance of some act (payment of $45,000 damages by Baron to Lissade);  with intent to do harm without excuse of justification (forcing Baron to stand trial based on claims that probable cause was found when the real purpose of issuing a finding of probable cause was to prevent Lissade from making further complaints against the above Commission attorneys); and in order to obtain a collateral objective that is outside the legitimate ends of the process (make Baron stand trial for discrimination, solely to avoid further complaints by Lissade against them,  even though they knew there was no probable cause).

186.     All of the above named officials possessed Lissade's therapy records and knew she never even mentioned Baron in therapy when they issued a finding of probable cause and sought $20,000 emotional damages against Baron at trial.

187.    To compound this issue Carlos Velez went from handling the investigation

into this matter and issuing a finding of probable cause (along with Karlin) to

supervising and participating in the prosecution of this matter at the Office of

Administrative Trials and Hearings (all in the wake of Lissade's multiple

complaints about Flyer and Velez).

188.    All of the defendants/ attorneys at the Commission were afraid of the

professional ramifications that Lissade's complaints would have on them and

abused their position of power by making an unsubstantiated and objectively

unreasonable finding of probable cause against Yunetta Baron, forcing her to

stand trial on a bogus discrimination claim, in order to protect their own jobs.

189.    Hence, defendants had an improper purpose in instigating this action,

issuing a notice of probable cause and pushing this case to a public trial at OATH

on November 7 and 9, 2016.

190.    All of the above defendants were state actors acting under color of state

law when they engaged in objectively unreasonable conduct.

191.    Defendants violated clearly established law in the Second Circuit, when

they engaged in malicious abuse of process in contravention of 42 USC Section

1983.

192.    Defendants Velez, Karlin, Flyer, Silverman, Sonpon, Srinisvasan, and

Kim violated plaintiff's fourteenth amendment right to a fair trial by engaging in

the following conduct: issuing illegal subpoenas in preparation for trial, without

giving notice to Baron or obtaining the OATH Judge's signature on those

subpoenas, as mandated by OATH rules; lying about the existence of evidence

they had acquired through those subpoenas and lying in response to discovery

demands about the existence of records they knew they had unlawfully

subpoenaed; lying about the existence of exculpatory notes (for years) reflecting

interviews of the Commissions alleged material witnesses (which highlighted

inconsistencies in the witnesses' stories)- which the Commission only disclosed

mid-trial and after Lissade testified in order to hinder plaintiff's ability to

meaningfully cross-examine (and in contravention of discovery obligations);

failing to disclose Lissade's damaging therapy records until ordered by the court;

failing to disclose the existence of illegally subpoenaed records until the actual

trial of Yunetta Baron was underway (despite violating discovery obligations)-

resulting in the sanction of preclusion for the above officials misconduct on or

about November 7,2016; and using plaintiff as a scapegoat by issuing a bogus

finding of probable cause so that they could prosecute her in accordance with

Lissade's wishes and avoid future complaints by Lissade- despite knowing

probable cause did not exist.

193.    To compound these malicious actions, aimed at ambushing Baron during

the trial and denying her of her 14th amendment right to a fair trial, Flyer and

Karlin then testified against Baron to the hearsay statements they obtained during

the interview process- violating attorney ethics rule barring an attorney from also

being a witness in a case he is the attorney on (Rule of Professional Conduct 3.7)

- all in an effort to avoid cross examination of Kladova and to appease Lissade

and avoid her making further complaints about the above attorneys.

194.    Moreover, Flyer gave false testimony pretending she had no knowledge

that Lissade had made complaints about her- even after being shown emails that

clearly reflected she knew that she and Velez had been the recipient of Lissade's

complaints before the notice of probable cause was issued, and that Lissade's

complaints had ultimately caused her to be removed from the case.

195.      Plaintiff seeks 20 million dollars in emotional damages, 20 million dollars

in punitive damages and $50,000 in compensatory damages.

196.      Plaintiff demands trial by jury.

`

Dated: November 3,2019

                                        /s/TAMARA HARRIS
                                        The Law Office of Tamara M. Harris
                                        111 Broadway, Suite 706
                                        New York, New York 10006
                                        (646)960-2057

                    VERIFICATION

      Tamara Harris, Esq., being duly sworn, states that she is an attorney duly admitted
to practice law in the State of New York and is the attorney for the plaintiff in the within
action; that the foregoing Verified Complaint is true to the best of her knowledge and
belief based on conversations with plaintiff and documents reviewed in relation to this
case.

      The undersigned further states that this verification is made by the undersigned
and not by the plaintiff because the plaintiff does not reside in the county where the
undersigned maintains her office.

Dated: November 3,2019                          /s/Tamara Harris